**THE RURAL NATURAL GAS CO. et al.**

v.

**ARVIN et al.**

Court of Appeals of Kentucky.

May 14, 1954.

Petition for Rehearing Withdrawn
Sept. 21, 1954.

John M. Berry, D. K. Floyd, New Castle, Norman A. Curtis, Louisville, J. Ballard Clark, Thos. F. Manby, La Grange, for appellants.

James A. Hall, George F. Williamson, LaGrange, for appellees.

CULLEN, Commissioner.

Clarence Arvin and wife recovered judgment, upon a jury verdict, against The Rural Natural Gas Company and the Theiss Appliance Company, in the amount of $5,885, for destruction of the Arvins' dwelling house, outbuildings, furniture and personal effects in a fire alleged to have been caused by negligence of the gas company and its agent, the appliance company. Upon this appeal, the two companies maintain that they were entitled to a directed verdict.

In October 1949 the Arvins purchased from the appliance company a gas cook stove, and arranged with the gas company, through the appliance company as its agent, for the installation of a "bottle gas" system and for the future maintenance of the system and the supplying of gas. The stove was installed in the kitchen against the back wall, which was also the back wall of the house. A pipe connected with the stove ran through the back wall to the supply system, which was set up directly outside the back wall. The system consisted of two gas cylinders, each of which was connected to a regulator, which in turn was connected to the pipe leading to the stove.

The back wall of the house consisted of 2 x 4 studs, 18 inches apart, with weatherboarding on the outside and wallboard

sheeting on the inside. The weatherboarding was not tightly nailed and it had some cracks in it. There was no flange on the outside of the hole through which the pipe ran into the kitchen.

The kitchen had no foundation under it, but rested on stone pillars some eight inches above the ground. Near the stove was an open hole in the floor, some three inches in diameter, through which a sink drain pipe formerly had run.

Under the method of operating the system, only one of the two gas cylinders was used at one time. The valve on the top of one of the cylinders was opened, and the gas thereupon flowed from this cylinder to the regulator, and then through the pipe to the stove. When this cylinder was exhausted, Mr. Arvin opened the valve on the other cylinder, and called the appliance company to bring a new cylinder to replace the exhausted one. Within a day or two the company would bring a new cylinder, and it, with valve closed, would be installed in place of the exhausted one. So, as time went by, the cylinders were used and replaced alternately.

The Arvins used the system without incident from October 1949 to October 8, 1951. During that time, according to their testimony, they never smelled any gas, although there was evidence for the company that it is customary for there to be a slight smell of gas shortly before a cylinder is exhausted. During the two-year period, they had used eight cylinders of gas, four on each side of the regulator. On October 8, 1951, cylinder No. 8, on the left side of the regulator, became exhausted, and Mr. Arvin turned on No. 9, on the right side. On the same day the appliance company brought cylinder No. 10, to replace No. 8, and it was attached to the regulator, presumably with the valve closed. Cylinder No. 9 therefore was the one being used at the time of the fire, which was on October 12.

The question of which cylinder was in use is important only because the Arvins endeavored to prove that over the two-year period the system had been in use there had been a constant loss of gas from the left side of the system. This proof consisted of evidence that the cylinders on the left side of the system had an average service period of only two months each, while the cylinders on the right side had an average service period of almost four months each. However, the fact that there may have been a constant loss from the left side of the system has no significance, in view of the fact that the right side was the one in use at the time of the fire.

The Arvins testified that beginning on October 8, 1951, and continuing until the day of the fire, they observed a strong odor around the house, which at the time they thought came from some cats that had crawled under the house and died, but which they later learned was the odor of "bottle gas". The odor was strong in the kitchen, and they also had noticed it outside the house, to a distance of 18 feet back of the house. During these days, however, they continued to use the stove with no trouble.

On October 12 Mrs. Arvin used the stove to cook breakfast, and again at noon to bake a cake. Around 3:30 that afternoon, her young daughter desired to bake some cup cakes, and Mrs. Arvin struck a match near the stove to light the oven. There was a flash explosion, which knocked Mrs. Arvin to the floor, and burned her face and arm. However, the daughter, who also was in the kitchen, was not hurt. The explosion caused no apparent damage to the kitchen. Mrs. Arvin went out in the yard, applied some home remedies to her burns, and then after a short time returned to the kitchen, where she (bravely, we must say) proceeded to light the oven and bake the cup cakes. She also lit one of the top burners to warm some chicken for her husband. The stove appeared to be operating properly. Mrs. Arvin then turned off the stove and, with her children, headed towards a neighbor's, with the view of being taken to a doctor. On the way they met her husband, on his way home from work, and he drove her to town to see a doctor. After visiting the doc-

tor they did some shopping, and then started home, after dark. As they approached their home, on the highway, they could see a light or glow through the kitchen window, and after they drove into the yard in back of the house they saw that the house was on fire, between the two studs where the gas pipe ran from the regulator to the stove. They called upon their neighbors for help, but were unable to extinguish the fire, and the house burned to the ground.

There was no evidence that the gas cylinders ever were on fire, or that there was fire playing around the regulator or along the pipe to the stove. Some neighbors who arrived shortly after the fire was discovered testified that the safety valves on the cylinders burned out and the cylinders discharged about the time the roof on the house fell in, after the fire had been burning for some time. These neighbors said positively that the cylinders were not on fire when they arrived at the scene.

We think it will be agreed that the Arvins had the burden of establishing (1) that there was negligence on the part of the gas company and its agents in the installation or maintenance of their gas supply system, as a result of which gas was escaping in and around the house, and (2) that the fire was caused by the escaping gas. While this burden could be met by circumstantial evidence, it could not be met by evidence merely furnishing a basis for conjecture or guesswork. McAtee v. Holland Furnace Co., Ky., 252 S.W.2d 427.

The only facts from which it could possibly be inferred that gas was escaping from the supply system are: (1) The fact that the cylinders on the left side of the system had a service period that was less than normal; (2) the fact that the Arvins smelled gas outside the house during the period from October 8 to October 12; and (3) the fact that there was an explosion in the kitchen on October 12.

As we previously have indicated, the fact that gas might have been escaping from the left side of the system over a period of two years is of no significance, because at the time of the fire it was the right side that was being used. Also, if gas had been escaping for two years, it is most unusual, to say the least, that the Arvins had not smelled gas and there had been no previous explosion.

Because the Arvins smelled gas outside the house, during the period from October 8 to October 12, they contend that there was gas escaping from the outside supply system, for which the companies were responsible, and not from the stove, for which the companies admittedly were not responsible. The Arvins maintain that the gas which exploded in the kitchen had seeped into the house through the hole in the kitchen floor, or through the space around the lead-in pipe, or through the cracks in the back wall. Since there was evidence that gas is heavier than air, and will sink to the ground from the point of escape, we think it is a reasonable inference that the gas which was smelled outside the house had leaked from the stove and escaped through the hole in the floor of the kitchen. In any event, it is just as reasonable to infer that the gas outside the house escaped from the house to the outside, through the holes or cracks, as it is to infer that the gas inside the house came in through the holes or cracks. Furthermore, if there was gas in and around the house from October 8 to October 12, as attempted to be shown by the Arvins, it is peculiar that no explosion occurred prior to October 12, since the stove was being used regularly during that period.

The fact that there was an explosion in the kitchen, on October 12, has no greater tendency to prove that gas was escaping from the outside system than it does to prove that gas was escaping from the stove itself. In fact, since the explosion was confined to the kitchen, it will be reasonable to assume that the gas was only in the kitchen, and not underneath the house and around the outside walls, because if the latter condition had existed the explosion probably would have been of greater magnitude and destructive power. A perfectly reasonable inference, from the explosion

that did occur, would be that a jet in the stove had inadvertently been left on or turned on. We think this inference could be made even though Mrs. Arvin testified positively that she had turned off all of the jets after using the stove at noon.

■ It is our opinion that the inferences arising from the circumstantial evidence of the Arvins are equally as consistent with no negligence on the part of the defendant companies as with negligence on their part. The evidence therefore was not sufficient to establish negligence. McAtee v. Holland Furnace Co., Ky., 252 S.W.2d 427.

The evidence that the fire was caused by escaping gas also is insufficient. The only theory upon which it could be said that the fire resulted from escaping gas is that the explosion in the afternoon (admittedly caused by escaping gas) started a fire behind the stove which Mrs. Arvin did not notice and which did not become large enough to be noticeable during the period of two or three hours between the time of the explosion and the time Mrs. Arvin left home to go to the doctor. This theory obviously is in the realm of speculation and conjecture.

■ As was said in McAtee v. Holland Furnace Co., Ky., 252 S.W.2d 427, it is common knowledge that many fires are mysterious and their origin cannot be determined. No one can state with any degree of certainty the cause or origin of the fire in the Arvins' home. The mere fact that the fire was localized, at the outset, in the wall between the stove and the gas supply system is not satisfactory proof that the fire was caused by escaping gas. There was no testimony that gas will start a fire by spontaneous combustion.

Opposed to the theory that the gas caused the fire is the fact that the gas supply system was not on fire when the wall began to burn.

Both of the Arvins testified that they did not know what caused the fire to start. They figured "it must have been the gas". While possibly it was the gas, with equal possibility it could have been any of a number of other causes. A jury could only guess as to the cause.

The judgment is reversed, with directions that if upon another trial the evidence is the same, the court shall direct a verdict for the defendants.